1

2

3

4

5

6

7

8 UNITED STATES DISTRICT COURT

9 NORTHERN DISTRICT OF CALIFORNIA

10 San Francisco Division

| | |
|---|---|
| 11 | C.L., | Case No. 22-cv-06035-LB |
| 12 | Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY** |
| 13 | v. | **JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR** |
| 14 | KILOLO KIJAKAZI, | **SUMMARY JUDGMENT** |
| 15 | Defendant. | Re: ECF Nos. 16, 21 |
| 16 | | |

17 **INTRODUCTION**

18 The plaintiff seeks judicial review of a final decision by the Commissioner of the Social

19 Security Administration denying her claim for social-security benefits under Titles II and XVI of

20 the Social Security Act. The plaintiff moved for summary judgment, seeking reversal and remand

21 without a rehearing of that decision.[1] The Commissioner opposed the motion and filed a cross-

22 motion for summary judgment, and the plaintiff filed a reply.[2] Under Civil Local Rule 16-5, the

23 matter is submitted for decision without oral argument. The court grants the plaintiff's motion (in

24 part), denies the Commissioner's cross-motion, and remands for further proceedings consistent

25 with this order.

26 ─────────────────

27 [1] Mot. – ECF No. 16. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

28 [2] Cross-Mot. – ECF No. 21; Reply – ECF No. 23.

United States District Court
Northern District of California

**STATEMENT**

**1.  Procedural History**

The plaintiff applied for Title II disability and disability insurance benefits and Title XVI supplemental security income on July 15, 2019.[3] The Commissioner denied her claim on September 9, 2019, and upon reconsideration on June 11, 2020.[4] The plaintiff asked for a hearing before an Administrative Law Judge (ALJ) on June 13, 2020.[5] On September 30, 2021, the ALJ held a telephonic hearing and heard testimony from the plaintiff and a vocational expert (VE).[6] The ALJ issued an unfavorable decision on October 20, 2021.[7] On August 31, 2022, the Appeals Council denied the plaintiff's request for review, and the ALJ's decision became the final administrative decision.[8]

On October 13, 2022, the plaintiff commenced this action for judicial review regarding her disability status.[9] The parties each moved for summary judgment.[10] All parties consented to magistrate-judge jurisdiction.[11]

**2.  Medical Records**

The plaintiff contended she was disabled because of the following conditions: lupus, chronic depression, interstitial cystitis (IC), and carpal tunnel.[12] The plaintiff was treated for these and other conditions (including uterine bleeding and fibromyalgia) at Santa Clara Valley Medical

---

[3] AR 16, 229–41. Administrative Record (AR) citations refer to the page numbers in the bottom-right hand corner of the AR.

[4] AR 16, 132–36, 139–41.

[5] AR 16.

[6] AR 16, 40.

[7] AR 16–32.

[8] AR 1.

[9] Compl. – ECF No. 1.

[10] Mot. – ECF No. 16; Cross-Mot. – ECF No. 21; Reply – ECF No. 23.

[11] Consents – ECF Nos. 8, 10.

[12] AR 98.

1    Center and Stanford Hospital.[13] Because the plaintiff challenges the ALJ's finding that the

2    plaintiff's IC, uterine bleeding, and fibromyalgia were not severe or medically determinable, this

3    order summarizes the plaintiff's history with these conditions. The plaintiff also challenges the

4    ALJ's consideration of the medical records, so this order summarizes the disputed opinions fully.

### 2.1   The Plaintiff's Impairments the ALJ Found Non-Severe or Not Medically Determinable

6        Regarding the plaintiff's IC, she had a cystoscopy procedure in January 2018 with results

7    consistent with IC. Her symptoms the following month included "urinary frequency every 15

8    min[utes] to 20 min[utes] and nocturia 3 times per night associated with urethral pain and bladder

9    pain."[14] In September 2019, the plaintiff reported her urinary frequency was four to five times per

10   night and every 30 minutes during the day. She used "3 pads daily" to control her symptoms.[15] In

11   November 2019, the plaintiff's symptoms had decreased with medication to urinary frequency two

12   times per night and at two-hour intervals during the day.[16] In January 2020, the plaintiff reported

13   no side effects from her medication and a continued decrease in her voidance to one time per night

14   and at two "hour intervals" during the day.[17] In July 2020, the plaintiff continued to report "no

15   significant side effects from the medication" and that her symptoms included "occasional urgency

16   when she waits too long to void" and urination frequency twice per night and at two to three hour

17   intervals during the day. Her doctor noted that she "can live a normal life."[18] In March 2020 and

18   2021, the plaintiff did have other remaining symptoms such as dysuria.[19]

19       As to the plaintiff's abnormal uterine bleeding, on March 17, 2020, the plaintiff's doctor wrote

20   that the plaintiff had been "concerned about excessively bleeding last year," but the plaintiff had

21

22

23

---

[13] AR 589–90, 621–22, 687, 704

[14] AR 395–396.

[15] AR 622.

[16] AR 620.

[17] AR 619, 632–34.

[18] AR 678–79.

[19] AR 652, 855.

United States District Court
Northern District of California

not bled since about January 15, 2020.[20] The plaintiff took Provera once a month from March to June 2020.[21] In June 2020, her doctor wrote that the plaintiff's abnormal bleeding was likely due to "hormonal shifts" or "adenomyosis."[22] In July and August 2020, the plaintiff experienced abnormal uterine bleeding whereby she experienced "heavy bleeding" and "two periods per month."[23] The plaintiff again experienced abnormal bleeding in March and April 2021.[24] In July 2021, she reported three weeks of "[l]ight then heavy bleeding."[25] Her doctor noted that she was taking "Micronor consistently" to treat her abnormal uterine bleeding, but she missed three consecutive doses in early April.[26]

Regarding the plaintiff's fibromyalgia, in August 2019, her rheumatologist Dr. Barkha Amlani diagnosed the plaintiff with fibromyalgia and noted that a Cymbalta trial could help with her fibromyalgia-related chronic pain and depression.[27] In December 2019, Dr. Amlani noted that the Amitriptyline that the plaintiff was taking could also help with her fibromyalgia-related chronic pain and depression.[28] In June 2020, a different doctor, Dr. Umang Barvalia, wrote that the plaintiff has had "chest pressure" since April 2019 but he was "not sure" if "'lung issues' or fibromyalgia or SLE" were the cause. He also reported that the plaintiff cannot sleep on her back because of pain, sleeps three to four hours per night, and takes anxiety medication to help her sleep.[29] In February 2021, the plaintiff started Cymbalta to treat her depression and anxiety, which Dr. Abishek Reddy noted could also "provide [a] benefit for [her] fibromyalgia."[30] The plaintiff's

---

[20] AR 646.

[21] AR 646, 743.

[22] AR 744.

[23] AR 704.

[24] AR 824.

[25] AR 881.

[26] AR 882.

[27] AR 607.

[28] AR 589.

[29] AR 723, 725.

[30] AR 799.

doctors continued to report that she had fibromyalgia through June 2021.[31]

The plaintiff's medical record also reflects other symptoms and conditions such as depression,[32] anxiety,[33] fatigue,[34] cognition or memory problems,[35] and widespread pain.[36]

### 2.2   Dr. Reddy

Dr. Abishek Reddy is the plaintiff's treating psychiatrist. The plaintiff started seeing a clinician in the clinic where Dr. Reddy works on November 20, 2019. She started seeing Dr. Reddy once every four weeks on February 3, 2021.[37]

Dr. Reddy's notes from his appointment with the plaintiff on February 16, 2021 reflect that she had anxiety, a history of sexual assault and self-harming behaviors, PTSD, difficulty sleeping, a history of heavy alcohol use, hearing voices, and difficulties with "cognition and being able to speak what is on her mind."[38]

On March 3, 2021, Dr. Reddy saw the plaintiff for a telepsychiatry appointment. His notes reflect that the plaintiff reported a "phobia of going to [the] doctor and getting blood work done" and "panic related symptoms." During the visit, the plaintiff mentioned that she had "only lasted about [one hour]" in a job helping a friend as a "merchandizer" because she "started hyperventilat[ing] and becoming short of breath."[39] Dr. Reddy found that the plaintiff was "not considered [an] imminent risk for self-harm or harm to others" nor was she "gravely disabled."[40]

On April 7, 2021, Dr. Reddy recorded that the plaintiff was "not doing too well," and was still "having difficulties sleeping and paranoia at night." Dr. Reddy noted that the plaintiff felt that a

---

[31] AR 892.

[32] AR 530, 889–90, 603, 639, 661, 706, 764, 773, 776, 784.

[33] AR 106, 513–14, 784, 799, 803, 807–08, 834, 902, 936.

[34] AR 90, 106, 396, 451, 483, 488, 520, 827.

[35] AR 106, 483, 804.

[36] AR 79–80, 488, 520, 524, 589, 603, 764.

[37] AR 792.

[38] AR 803–04.

[39] AR 797.

[40] AR 798.

United States District Court
Northern District of California

recent gynecology appointment set her back in overcoming her social anxiety. The plaintiff also reported having "outbursts where she screams and fears she will alienate [her] family" and being "afraid to do things outside [or] interact with others."[41]

Dr. Reddy completed a residual functional capacity (RFC) questionnaire regarding the plaintiff on April 15, 2021.[42] Dr. Reddy found that "[b]ased on current mental health symptoms, [the plaintiff] has sufficient impairment with focus and completing tasks, has severe anxiety and panic attacks which make it difficult for her to perform adequately in [a] work setting and handle stressors and change." He also anticipated that the plaintiff's impairments would cause her to be absent from work more than four days per month and to need unscheduled fifteen-minute breaks every one to two hours during an eight-hour workday.[43] Despite these findings, Dr. Reddy found that the plaintiff would be able to work on a full-time basis with limitations, but her conditions would preclude her from certain work.[44]

On May 13, 2021, Dr. Reddy noted that the plaintiff was doing better with "not feeling too fatigued," still had some anxiety, reported being easily frustrated and angering easily, having "vague hallucinations at bedtime," and reported "improvement of depression."[45] On June 10, 2021, Dr. Reddy wrote that the plaintiff reported depressive symptoms but "overall report[ed] improvement with psychiatric symptom burden."[46] On June 24, 2021, Dr. Reddy reported that the plaintiff still had some problems with motivation, fatigue, and "inner voices."[47] On July 20, 2021, Dr. Reddy wrote that the plaintiff felt "improvement in motivation," was still experiencing "vague hallucinations," and reported "increased panic attacks and anxiety."[48]

---

[41] AR 936.

[42] AR 791.

[43] AR 794.

[44] AR 795.

[45] AR 928.

[46] AR 926.

[47] AR 920.

[48] AR 914.

### 2.3   Dr. Covey

Dr. Elizabeth Covey is a state agency psychological consultant and was one of the doctors who made the plaintiff's disability determination at the reconsideration level.[49] On June 10, 2020, Dr. Covey reported that the plaintiff had three severe impairments: (1) systemic lupus erythematosus; (2) depressive, bipolar, and related disorders; (3) anxiety and obsessive-compulsive disorders.[50] Dr. Covey made these determinations based on an "Initial Mental Health assessment 10/19, with notes through 4/2020" and found an RFC assessment to be necessary.[51] Dr. Covey noted that the plaintiff had the following symptoms: pain, weakness, understanding and memory limitations, sustained concentration and persistence limitations, social interaction limitation, and ability to adapt limitations. Dr. Covey found, however, that the plaintiff's statements regarding her symptoms were only "partially consistent" with the medical and non-medical evidence in the record. As to medical opinions though, Dr. Covey found there was "no indication that there [was] a medical opinion from any medical source."[52]

In her Mental Residual Functional Capacity (MRFC), Dr. Covey found that the plaintiff has "sustained concentration and persistence limitations" and an "adaptation limitation," but that the plaintiff does not have "social interaction limitations."[53]

### 2.4   Dr. Linder

Dr. J. Linder is a state agency internal medicine consultant who made the plaintiff's disability determination at the initial level.[54] On September 6, 2019, Dr. Linder found that the plaintiff had two medically determinable impairments: (1) systemic lupus erythematosus and (2) depressive bipolar and related disorders. Dr. Linder deemed the plaintiff's systemic lupus erythematosus a

---

[49] AR 28.

[50] AR 107.

[51] AR 108.

[52] AR 109.

[53] AR 111–12.

[54] AR 28.

United States District Court
Northern District of California

severe impairment.[55] Dr. Linder recommended a "light RFC w[ith] env[ironmental] limitations" and found the plaintiff has environmental limitations that required her to "[a]void even moderate exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc."[56] Dr. Linder did not have "sufficient vocational information to determine whether [the plaintiff] can perform any of [her] past relevant work," but concluded that the plaintiff is not disabled as she could adjust to light work such as "[o]ther work with [the] combined impairments."[57]

### 2.5   Dr. Dale

Dr. G. Dale is a state agency internal medicine consultant and was one of the doctors who made the plaintiff's disability determination at the reconsideration level. On June 5, 2020, Dr. Dale confirmed the determination at the initial level that the plaintiff was not disabled but required a light RFC.[58] In particular, Dr. Dale found that the plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, and stand and sit for a total of about six hours in an eight-hour workday with normal breaks. Dr. Dale also found the plaintiff had an environmental limitation because she needed to "avoid even moderate exposure" with "[f]umes, odors, dusts, gases, poor ventilation, etc."[59]

### 3.   Non-Medical Evidence

### 3.1   Third-Party Function Reports of S.L.

The plaintiff submitted third-party function reports from her sister, S.L., on August 6, 2019, at the initial level and on February 7, 2020, at the reconsideration level.[60] S.L. said that the plaintiff

---

[55] AR 73, 80–81.

[56] AR 80, 83–84.

[57] AR 84–85.

[58] AR 107.

[59] AR 109–10.

[60] AR 289, 337.

United States District Court
Northern District of California

"cannot function," is "always tired, upset, mad[,] sad[, or] frustrated," and that her "physical health is keeping her from going outside due to pain."[61]

S.L. reported that the plaintiff's daily activities consist of sleeping, walking her dog for five minutes, drinking coffee but "barely" eating, and doctor appointments when scheduled.[62] S.L. described the plaintiff as "very happy, outgoing" and "independent," and that she loved drives, "visit[ing] new places, dancing, [and] eating at restaurants" before being diagnosed with lupus.[63] With her illnesses, she receives visits from her sister, sons, and friends on a daily basis as tolerated.[64] The plaintiff's mood swings affect her relationships, and the plaintiff prefers to stay home alone.[65] In her second report, S.L. described the plaintiff as "phobic about being in public."[66] As for hobbies, the plaintiff watches her pets and television but otherwise does not have hobbies.[67]

S.L. further explained that the plaintiff's disabilities affect her sleep, necessitate that others provide reminders for the plaintiff to take care of her personal needs and grooming, and render her unable to pay her bills.[68] S.L. also reported that the plaintiff "can only walk for a few minutes, [is] hard of hearing, forgets things, cannot lift more than [ten pounds, and has] mobility issues and shortness of breath."[69] Further, the plaintiff "is not able to handle stress, loses her patience quickly and gets angry or sad."[70] In her second report, S.L. indicated that the plaintiff is "anxious at night" and "says she sees things or hears noises and voices."[71] As for household tasks, S.L. wrote that "cleaning the house is a challenge" because the plaintiff "tires easily" and is "sensitive to dust and

---

[61] AR 289.

[62] AR 289–90, 331.

[63] AR 290, 296, 331.

[64] AR 293.

[65] AR 294, 335.

[66] AR 330.

[67] AR 293, 334.

[68] AR 290–92, 332.

[69] AR 294.

[70] AR 295.

[71] AR 331.

cleaning products."[72] S.L. also wrote that the plaintiff cannot go out alone because "[h]er body is not stable, she's fragile, she has vertigo, she's anxious and afraid to be alone."[73]

### 3.2   Observations of Social Security Claims Representatives G. Martinez and D. Tran

Two Social Security claims representatives, G. Martinez and D. Tran, provided Disability Reports in connection with the plaintiff's claim for disability and disability insurance benefits.[74] Martinez observed that the plaintiff had difficulty talking, standing, and walking in a July 15, 2019 report. Martinez further wrote that the plaintiff "was constantly coughing," "appear[ed] tired," "stood up slowly and walked away slowly," and her "voice fade[d] as she [was] talking."[75] Tran noted in a January 7, 2020, report that the plaintiff had difficulty breathing, concentrating, and answering questions. Specifically, Tran described the plaintiff's "difficulty express[ing] and saying the information out to [Tran]" and that the plaintiff had a "cough and []difficulty breathing while talking."[76]

## 4.  Administrative Proceedings

### 4.1   Disability-Determination Explanations

During the administrative process, state agency internal medical consultants generated two disability-determination explanations, one for the plaintiff's initial application and another at the reconsideration level. The plaintiff filed an initial claim for disability on July 15, 2019, based on the following conditions: lupus, chronic depression, IC, and carpal tunnel.[77]

At the initial level, the state doctors found the plaintiff's systemic lupus erythematosus to be a severe impairment.[78] As explained above, Dr. Linder found the plaintiff required a light RFC for

---

[72] AR 332.

[73] AR 333.

[74] AR 263, 315.

[75] AR 264–65.

[76] AR 316.

[77] AR 76.

[78] AR 80.

United States District Court
Northern District of California

her physical conditions but was not severely impaired in terms of her psychiatric conditions.[79] The doctors found the plaintiff to be not disabled despite this impairment.[80]

Upon reconsideration, the state doctors found the following conditions to be severe: (1) systemic lupus erythematosus; (2) depressive, bipolar, and related disorders; and (3) anxiety and obsessive-compulsive disorders.[81] The state doctors again found the plaintiff to be not disabled.[82]

### 4.2   Administrative Hearings

The ALJ held an administrative hearing on September 30, 2021, during which he heard testimony from the plaintiff and a VE, Shannon Hollander.

#### 4.2.1   Plaintiff's Testimony

The ALJ and the plaintiff's attorney questioned the plaintiff.[83] The plaintiff testified that she was born in 1971.[84] She started the twelfth grade, but she did not finish high school nor complete her GED or any other certification after high school.[85]

The plaintiff testified to her work history, beginning with her position as a housekeeper for Marriott International in 2004 for about nine or ten months.[86] The plaintiff then worked a series of cashier and barista jobs until 2019 where she stocked items, prepped grab-and-go items, made coffee, and had to lift between 50 and 75 pounds.[87] Following her housekeeping job, the plaintiff worked as a cashier in a Marriott coffee shop for almost eight years.[88] In 2014, she worked for Amtrak but left because she needed more hours.[89] From 2016 to 2018, she worked at

---

[79] AR 81–84.

[80] AR 85.

[81] AR 107.

[82] AR 113.

[83] AR 43–61.

[84] AR 44.

[85] AR 44–45, 54, 58.

[86] AR 49.

[87] AR 45–50.

[88] AR 49–50.

[89] AR 48.

Guckenheimer Enterprises until she started feeling sick and filed a workers' compensation claim.[90] She next worked at Frye's Electronics for about four months working 40 hours per week in 2019 but left the job when she started having mobility issues.[91] The plaintiff last worked in July 2019 as a cashier at a juice bar for two weeks.[92]

The plaintiff also described her mental health conditions, including anxiety, hallucinations, mania, bipolar and borderline personality disorders, depression, and PTSD.[93] She has had these conditions since she was a teenager, but her anxiety and other conditions reached their current levels after she had a septic infection in September 2019 for which she had to be on a ventilator.[94] To treat her conditions, the plaintiff sees a psychiatrist once a month and a therapist once a week for about 45 minutes. She also takes medication for her depression, anxiety, bipolar disorder, and mania. The medication has changed four times, but the plaintiff testified that it does not seem to reduce her symptoms as she still "hear[s] voices," "see[s] things," and has anxiety. She testified that she hears and cannot ignore about fourteen different clear voices that tell her to "not to take [her] medication," "tell [a] person not to look at me," or "just to sleep." She also sees things like "bugs," "shadows," and "a person with horns that look like a . . . goat, but he actually stands up."[95] While the plaintiff had these symptoms before September 2019 and could not ignore them then, she testified that she was able to work before September 2019 because she did not have the same physical conditions nor was her PTSD and anxiety as bad as it has been since her septic infection.[96] Though she has a license, the plaintiff cannot drive because of her anxiety. Her sons live nearby and visit every day to help with dogs, cleaning, laundry, and to drive her to run errands.[97]

---

[90] AR 47–49.

[91] AR 45–46.

[92] AR 46.

[93] AR 50–51.

[94] AR 51, 58.

[95] AR 58–60.

[96] AR 61.

[97] AR 45, 57–58.

United States District Court
Northern District of California

The plaintiff testified to her physical conditions, including lupus, fibromyalgia, a uterine condition (which she testified is endometriosis) where she bleeds 20–25 days a month, and IC.[98] The plaintiff also had a history of heavy alcohol use, but she stopped drinking on September 4, 2019.[99] The plaintiff testified that her IC is "a little bit controlled."[100] A rheumatologist at the San Jose Medical Hospital diagnosed her with fibromyalgia. The plaintiff takes daily medication for her fibromyalgia, but she testified that the medication does not really alleviate her symptoms which include nerve pain and skin sensitivity.[101] Regarding her lupus, doctors' notes indicate that the condition is inactive, but the plaintiff testified that she understands this to mean that her condition does not require her to take stronger medication like steroids. She testified that she still has pain "24/7" in her joints (her knees specifically) and fatigue.[102] As a result of her conditions, the plaintiff testified that she can walk for up to an hour, stand for about thirty minutes, sit in a chair for forty-five minutes before needing to stand, carry about twenty-five pounds across a room but only ten pounds consistently throughout the workday, cannot bend at the waist nor squat, and can go up and down the stairs slowly.[103] For the twenty to twenty-five days a month that she bleeds, the plaintiff testified that she would need to use the bathroom every hour for about ten minutes. The plaintiff also experiences side effects from the medication she takes, including trouble concentrating, grogginess, dizziness, and nausea.[104]

When her attorney asked, the plaintiff testified that she could not perform a job where she could sit or stand whenever she wanted to, lift about ten pounds, and perform simple and repetitive tasks because she has "really bad general anxiety."[105]

---

[98] AR 50–52.

[99] AR 56–57.

[100] AR 52.

[101] AR 52.

[102] AR 52, 55–56.

[103] AR 53, 54.

[104] AR 56.

[105] AR 57.

United States District Court
Northern District of California

### 4.2.2   VE's Testimony

VE Shannon Hollander testified at the September 30, 2021 hearing.[106] The ALJ asked the VE to classify the plaintiff's prior work according to the Dictionary of Occupational Titles. The VE described the plaintiff's work as a counter attendant (light exertion level, SVP 3, semi-skilled, performed up to the heavy exertion level) and housekeeper (heavy exertion level, SVP 2, unskilled, performed at heavy).[107] The plaintiff's attorney questioned why the stocking component of the plaintiff's counter attendant jobs would not require a higher exertion level. The VE testified that stocking is "typical for those jobs" and "it's typically not heavy items" (i.e., items up to twenty pounds rather than fifty as the plaintiff testified).[108]

The ALJ posed the first hypothetical to the VE: a person of the plaintiff's age, education level, and work experience who can "lift and carry, push and pull, 20 pounds occasionally and 10 pounds frequently, can stand and walk for six hours of an eight-hour workday, can sit for six hours of an eight-hour workday," "can frequently stoop, climb ramps and stairs, and balance," "[c]an occasionally kneel, crawl, and crouch, and climb ladders, ropes, and scaffolds," "can understand, remember, and carry out simple tasks but not at an assembly line rate, [and] can make simple, work-related decisions," but "must avoid concentrated exposure to extreme cold, extreme heat, humidity, and pulmonary irritants, and should never be exposed to unprotected heights or dangerous, unprotected machinery."[109] The VE testified that the hypothetical person could not perform the plaintiff's past work but could perform the following jobs: (1) "small parts assembler," (2) "electronics worker," and (3) "inspector and hand packager."[110]

The ALJ posed the second hypothetical to the VE. In addition to the conditions of the previous hypothetical, the person can "only occasionally stoop, climb ramps and stairs, kneel, crawl, and crouch, and can never climb ladders, ropes, or scaffolds," can sit for six hours of an eight-hour

---

[106] AR 62–69.

[107] AR 62–63.

[108] AR 69.

[109] AR 63.

[110] AR 63–64.

workday, and can stand for an eight-hour workday but would be required to sit for ten minutes after every thirty minutes of standing or walking. The VE responded that the hypothetical person could perform the same jobs as those listed previously, but there would be 75% fewer jobs available. [111]

The ALJ posed a third hypothetical to the VE: the individual "require[s] an allowance to be off-task at least 20% of an eight-hour workday, in addition to regularly permitted breaks, due to medical impairments."[112] The VE testified that no jobs are available to such a person because regular breaks in unskilled employment are a "10-minute morning break, 30-minute lunch break, and a 15-minute afternoon break."[113] The plaintiff's attorney asked if ten-minute bathroom breaks every hour would be permitted. The VE responded that they would not be permitted because while "one to two additional breaks may be permitted but lasting no more than about five minutes," requiring a bathroom break "every hour would be excessive."[114]

### 4.3   ALJ Findings

The ALJ analyzed the five-step process to determine whether the plaintiff was disabled and concluded that she was not disabled from December 22, 2018, to the date of the ALJ's decision.[115]

At step one, the ALJ found that the plaintiff did not engage in substantial gainful activity since the alleged onset date of December 22, 2018.[116]

At step two, the ALJ found the plaintiff had the following severe impairments: systemic lupus erythematosus (SLE), obesity, unspecified mood disorder, generalized anxiety disorder, and PTSD. The ALJ found that the following diagnosed impairments were non-severe: IC, pyelonephritis, acute epiglottitis, colitis, pancreatitis, mild obstructive airway disease, hyperlipidemia, abnormal uterine bleeding, anemia, sensorineural hearing loss, and history of

---

[111] AR 64–66.

[112] AR 66.

[113] AR 66–67.

[114] AR 67.

[115] AR 31.

[116] AR 18.

United States District Court
Northern District of California

polysubstance use.[117] Finally, the ALJ found that the following impairments were not medically determinable: neck pain, shoulder pain, knee pain, carpal tunnel syndrome, and fibromyalgia.[118]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[119]

Before reaching step four, the ALJ determined the plaintiff's residual functional capacity:

> [T]he claimant has the residual functional capacity to perform light work . . . except the claimant can lift and carry, push and pull 20 pounds occasionally and 10 pounds frequently; can stand and walk for 6 hours of an 8 hour work day, for 30 minutes at time, with the option to sit at the work station for 10 minutes and continue working after 30 minutes of standing or walking; can sit for 6 hours of an 8 hour work day; and can occasionally stoop, climb ramps and stairs, kneel, crawl, and crouch, and never climb ladders, ropes, or scaffolds. She must avoid concentrated exposure to extreme cold, extreme heat, humidity, and pulmonary irritants, and should never be exposed to unprotected heights or dangerous, unprotected machinery. She can understand, remember, and carry out simple tasks but not at an assembly line rate; and can make simple work-related decisions.[120]

At step four, the ALJ found that the plaintiff was unable to perform any past relevant work.[121]

At step five, the ALJ found the following jobs were available to the plaintiff: (1) small parts assembler, (2) data entry, (3) home.[122]

The ALJ found the plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and concluded that the plaintiff was "not disabled."[123]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set

---

[117] AR 19.

[118] AR 21.

[119] AR 22–24.

[120] AR 24–29.

[121] AR 29–30.

[122] AR 30–31.

[123] AR 31.

aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (cleaned up); 42 U.S.C. § 405(g). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and must be more than a mere scintilla, but may be less than a preponderance." *Kitchen v. Kijakazi*, 82 F.4th 732, 738 (9th Cir. 2023) (cleaned up). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098−99 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" . . . and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzalez v. Sec'y of Health & Hum. Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff contends that the ALJ erred by (1) finding the plaintiff's fibromyalgia, interstitial cystitis, and uterine bleeding impairments non-severe or not medically determinable at step two and failing to consider them in his RFC analysis, (2) improperly considering the medical evidence, (3) rejecting the plaintiff's testimony, and (4) disregarding third-party witness statements.

## 1.  Whether the ALJ Erred by Finding the Plaintiff's Fibromyalgia, Interstitial Cystitis, and Uterine Bleeding Disorder Non-Severe or Not Medically Determinable Impairments

The plaintiff argues that the ALJ erred in finding her IC and abnormal uterine bleeding non-severe and her fibromyalgia not medically determinable. According to the plaintiff, the ALJ improperly "h[eld] [her] to a higher standing than is required" by not supporting his findings with substantial evidence and failing to include the impairments in his RFC analysis.[124] The

---

[124] Mot. – ECF No. 16 at 17.

1  Commissioner responds that the ALJ followed the appropriate standard, there was ample evidence

2  to support his findings, and any error was harmless.[125] The court remands on this issue.

3      At step two of the five-step sequential inquiry, the ALJ determines whether the claimant has a

4  medically severe impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273,

5  1290 (9th Cir. 1996). The ALJ must consider the record as a whole, including evidence that both

6  supports and detracts from his final decision. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir.

7  1998). An impairment is not severe if it does not significantly limit the claimant's mental or

8  physical abilities to do basic work activities. 20 C.F.R. § 404.1522(a). Basic work activities are

9  "abilities and aptitudes necessary to do most jobs," including, for example, "walking, standing,

10  sitting, lifting, pushing, pulling, reaching, carrying, or handling." *Id.* § 404.1522(b).

11      "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims."

12  *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). Thus, "[a]n

13  impairment or combination of impairments can be found 'not severe' only if the evidence

14  establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability

15  to work." *Id.* (cleaned up) (first citing SSR 85-28; then citing *Yuckert v. Bowen*, 841 F.2d 303, 306

16  (9th Cir. 1988)).

17      The first question is whether the ALJ erred in finding the plaintiff's IC and abnormal uterine

18  bleeding to be medically determinable impairments but non-severe at step two. The plaintiff

19  argues that the ALJ did not consider Social Security Ruling (SSR) 15-1p in his analysis of the

20  plaintiff's IC.[126] The Commissioner responds that the plaintiff fails to identify how the ALJ's

21  determination did not align with SSR 15-1p and that the ALJ "complied with the requirement that

22  IC be evaluated to determine whether it was a severe impairment."[127] The plaintiff also argues that

23  the ALJ held the plaintiff to an "impermissibly high standard" in determining that her abnormal

24  uterine bleeding was a non-severe impairment as "[t]here is no legal requirement that . . . she has

25

26

---

27  [125] Cross-Mot. – ECF No. 20 at 2–5.

    [126] Mot. – ECF No. 16 at 18.

28  [127] Cross-Mot. – ECF No. 20 at 3.

United States District Court
Northern District of California

had a doctor provide an opinion on specific vocational limitations related to her conditions."[128]

The Commissioner does not address this issue in the cross-motion.[129]

SSR 15-1p provides the standard for assessing cases involving IC. *See* SSR 15-1p, 2015 WL 1292257 (Mar. 18, 2015). "The Commissioner issues Social Security Rulings" that "do not have the force of law," but courts give them some deference because "they represent the Commissioner's interpretation of the agency's regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001). To determine whether a claimant's medically determinable impairment of IC is severe at step two, SSR 15-1p states:

> If we find that a person with IC has an MDI that meets the duration
> requirement, and the person alleges pain and other symptoms consistent with IC,
> we must consider these symptoms in deciding whether the person's impairment is
> "severe" at step 2 of the sequential evaluation process, and at any later steps
> reached in the sequential evaluation process. If we find that the person's pain,
> urinary urgency or urinary frequency, or other symptoms have more than a
> minimal effect on a person's ability to perform basic work activities, we must find
> that the person has a "severe" impairment.

*Id.* at *8. Furthermore, "at the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." *Smolen*, 80 F.3d at 1290; *see also* 42 U.S.C. § 423(d)(2)(B).

The ALJ found the plaintiff's IC to be a non-severe impairment after describing the plaintiff's treatment and symptoms over two years. He also noted that the plaintiff's "urologist concluded that her interstitial cystitis was stable and well controlled with amitriptyline" in January 2020 and "remained well controlled at her next urology follow up appointment in July 2020."[130] As to the plaintiff's abnormal uterine bleeding, the ALJ described several instances where the plaintiff "experienced an episode of abnormal uterine bleeding," but noted that "no doctor has noted any vocational limitations related to her abnormal uterine bleeding."[131]

The plaintiff claims that these impairments were severe because as a result of their combined

---

[128] Mot. – ECF No. 16 at 19.

[129] Cross-Mot. – ECF No. 20.

[130] AR 19.

[131] AR 21.

effect, she must the bathroom more frequently than a non-impaired individual, is fatigued, and has disrupted sleep.[132]

The ALJ erred in failing to consider the combined effect of the plaintiff's illnesses, failing to accord sufficient weight to the plaintiff's interstitial cystitis, and failing to consider the plaintiff's subjective reports of urinary issues. *See Allende-Scott v. Astrue*, No. CV 09-9404 CW, 2010 WL 4916594, *3–4 (C.D. Cal. Nov. 27, 2010) (Plaintiff's IC improved initially with medication, but she was subsequently hospitalized and the frequency of her "voidings had returned to every 10 minutes" before decreasing again to "about every hour" while on medication; held that the ALJ erred in finding the plaintiff's IC to be non-severe because the "hospitalization and the regression of the plaintiff's voiding frequency . . . call into question the stability of her treatment"); *Sallee v. Comm'r of Soc. Sec. Admin*., No. CV-17-04504-PHX-DWL, 2019 WL 669797, at *2 (D. Ariz. Feb. 19, 2019) (finding that ALJ had failed to identify any evidentiary support in the record for conclusion of "minimal limitation" on ability to work). Also, the ALJ considered the progress notes of Dr. Philip Mark Hanno but did not consider them in combination with other illnesses suffered by the plaintiff and did not consider the plaintiff's subjective description of her symptoms.

The second question is whether the ALJ erred in finding the plaintiff's fibromyalgia not medically determinable. The plaintiff argues that the ALJ erred because there was sufficient objective evidence in the record to establish that the plaintiff's fibromyalgia was a medically determinable impairment even though the plaintiff's doctor did not administer a tender point test.[133] The Commissioner responds that record supported the ALJ's determination because there was no objective evidence to support fibromyalgia as a medically determinable impairment.[134]

Medically determinable impairments are "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic

---

[132] Mot. – ECF No. 16 at 19.

[133] *Id.* at 20.

[134] Cross-Mot. – ECF No. 20 at 4.

techniques." *Tomasek v. Astrue*, No. C-06-07805 JCS, 2008 WL 361129, at *14 (N.D. Cal. Feb. 11, 2008). That is, the impairment must "be established by medical evidence that consists of signs, symptoms, and laboratory findings, and not only by an individual's statement of symptoms." *Id.* Given that step two is a de minimis screening device, the plaintiff's burden on these points is "low." *Id.* at *13.

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). There are "no laboratory tests to confirm the diagnosis" of fibromyalgia, so the "patients' reports of pain and other symptoms" serve as the basis for a diagnosis. *Id.*

SSR 12-2p provides the criteria for determining whether a plaintiff's fibromyalgia is a medically determinable impairment. SSR 12-2p, 2012 WL 3104869 (July 25, 2012). The plaintiff must provide evidence from a "licensed physician" that "document[s] that the physician reviewed the person's medical history and conducted a physical exam." *Id.* at *2. The physician must diagnose the plaintiff with fibromyalgia and that diagnosis must be consistent "with the other evidence in the person's case record." *Id.* Furthermore, the physician must include evidence that the plaintiff meets the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria. *Id.* Under the 1990 ACR criteria, the plaintiff has fibromyalgia if (1) she has a "history of widespread pain" for at least three months, (2) she has "[a]t least 11 positive tender points on physical examination," and (3) "other disorders that could cause the symptoms or signs were excluded." *Id.* at *2–3. Alternatively, the plaintiff meets 2010 ACR criteria if (1) she has a "history of widespread pain" for at least three months, (2) she has "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome," and (3) "other disorders that could cause the symptoms or signs were excluded." *Id.* at *3.

The ALJ found that the plaintiff's fibromyalgia was not medically determinable because although the plaintiff's rheumatologist diagnosed her with fibromyalgia, her doctor did not

United States District Court
Northern District of California

1   "perform[] a tender point examination or detail[] objective signs of fibromyalgia that comply with

2   the requirements of SSR 12-2p."[135] The parties do not dispute that the plaintiff's doctor did not

3   perform a tender point examination.[136]

4       The plaintiff's rheumatologist, Dr. Amlani, diagnosed the plaintiff with fibromyalgia after the

5   plaintiff reported pain in right shoulder pain, knees and heels, "significant fatigue," "brain fog,"

6   and "worsening in pain all over."[137] Dr. Amlani also conducted a joint examination in which the

7   plaintiff's right and left shoulders were tender.[138] Dr. Amlani did not document that the plaintiff

8   had "six or more [fibromyalgia] symptoms, signs, or co-occurring conditions." SSR 12-2p, 2012

9   WL 3104869, at *3. But the plaintiff cites evidence in the record of other symptoms and co-

10  occurring conditions, such as widespread pain, depression, anxiety, cognitive or memory

11  problems, blurred vision, and interstitial cystitis.[139]

12      The plaintiff has shown evidence, especially given her low burden at step two, that satisfies the

13  2010 ACR criteria. *See Ford v. Saul*, 950 F.3d 1444, 1155 n.7 (9th Cir. 2020) (affirming the ALJ's

14  finding that the plaintiff's fibromyalgia was not medically determinable where the doctor's

15  diagnosis "consisted only of the single word 'fibromyalgia," and did not explain how [the

16  plaintiff] met either the 1990 or the 2010 criteria" and the plaintiff did not "point to evidence in

17  the record satisfying the 2010 criteria").

18      In sum, the ALJ's decision reflects step-two error on the severity and medical determinability

19  of some of the plaintiff's impairments. This error was also not harmless because it factored into

20  the ALJ's RFC assessment. The court therefore remands on this ground.

21

22

23

24

---

25  [135] AR 22.

26  [136] Mot. – ECF No. 16 at 21; Cross-Mot. – ECF No. 20 at 4.

27  [137] AR 603.

    [138] AR 606.

28  [139] Mot. – ECF No. 16 at 20–21.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.   Whether the ALJ Erred in Considering the Medical Evidence

The plaintiff argues that the ALJ erred in finding Dr. Reddy's opinion unpersuasive, Dr. Covey's opinion persuasive, and Drs. Linder and Dale's opinion "generally persuasive."[140] The Commissioner contends that the ALJ properly credited or discredited the opinions of these four doctors.[141] The court partially remands on this ground.

The ALJ is responsible for "resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.920b; *see Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (cleaned up).

The Social Security Administration promulgated new regulations governing an ALJ's consideration of medical opinions, effective March 27, 2017. The new framework "eliminate[s] the physician hierarchy, deference to specific medical opinions, and assigning weight to a medical opinion." *V.W. v. Comm'r of Soc. Sec.*, No. 18-CV-07297-JCS, 2020 WL 1505716, at *14 (N.D. Cal. Mar. 30, 2020) (cleaned up); 20 C.F.R. § 416.920c(a). Likewise, the Ninth Circuit's previous "requirement that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion" is "incompatible with the revised regulations." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). But the ALJ must still articulate how he or she considered every medical opinion and how persuasive he or she finds each. *Id.*; *V.W.*, 2020 WL 1505716, at *14; 20 C.F.R. § 416.920c(b). Persuasiveness is now evaluated based on five factors: "1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) 'other factors.'" *V.W.*, 2020 WL 1505716, at *13 (citing 20 C.F.R. § 416.920c(c)); *Woods*, 32 F.4th at 792 (factors include "the length and purpose of the treatment relationship, the frequency of examinations, the

---

[140] Mot. – ECF No. 16 at 23–26.

[141] Cross-Mot. – ECF No. 20 at 5–8.

United States District Court
Northern District of California

1   kinds and extent of examinations that the medical source has performed or ordered from

2   specialists, and whether the medical source has examined the claimant or merely reviewed the

3   claimant's records").

4       Supportability and consistency are the two most important factors, and the ALJ is required to

5   specifically address them. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ cannot reject an examining or

6   treating doctor's opinion as unsupported or inconsistent without providing an explanation

7   supported by substantial evidence." *Kitchen*, 2023 WL 5965704 at *5. Regarding supportability,

8   "[t]he more relevant the objective medical evidence and supporting explanations presented by a

9   medical source are to support his or her medical opinion(s) or prior administrative medical

10   finding(s), the more persuasive the medical opinions or prior administrative medical finding(s)

11   will be." 20 C.F.R. § 416.920c(c)(1). Regarding consistency, "[t]he more consistent a medical

12   opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

13   sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

14   administrative medical finding(s) will be." *Id.* § 416.920c(c)(2).

15       Unlike with supportability and consistency, the ALJ is not normally required to explain how

16   he or she considered the other factors. *V.W.*, 2020 WL 1505716, at *14; 20 C.F.R. §

17   416.920c(b)(2). But the ALJ is required to do so where "two or more medical opinions or prior

18   administrative medical findings about the same issue are both equally well-supported . . . and

19   consistent with the record . . . but are not exactly the same." 20 C.F.R. § 416.920c(b)(3).

20       First, in assessing the persuasiveness of Dr. Reddy's opinion, the ALJ found that his opinion is

21   "inconsistent with the treatment records of the claimant's former psychiatrist" and "unsupported

22   by his own treatment records."[142] This explanation is at least supported by substantial evidence,

23   even if a different result could also have been reached.

24       Second, another issue is whether the ALJ erred in finding Dr. Covey's opinion persuasive. The

25   ALJ found that her opinion was "generally supported by her own review and analysis of the

26   available evidence" and that it was "consistent with the claimant's recent psychiatric treatment

27

28   [142] AR 29.

records and her self-reported activities of daily living."[143] The plaintiff argues that the ALJ mentioned only two of Dr Covey's opinions, but failed to address restrictions described by Dr Covey. But the ALJ addressed supportability and consistency in a way supported by substantial evidence.

Third, the plaintiff argues that the ALJ erred in finding the opinions of Drs. Linder and Dale generally persuasive. The ALJ found their opinions "generally supported by their own review and analyses of the available evidence" and "somewhat consistent with later evidence that shows the claimant's lupus because inactive with treatment." The opinions were not totally persuasive though, because they did "not contain adequate postural or environmental limitations."[144] The plaintiff contends that these doctors' findings were not well supported because they did not mention all her diagnoses. The defendant responds that these doctors did not need to discuss the symptoms of fibromyalgia and IC specifically because they were either non-medically determinable or non-severe. As the court has found that the ALJ's step-two analysis was error, the ALJ can reconsider the opinions of Drs. Linder and Dale on remand.

### 3. Whether the ALJ Erred by Discounting the Plaintiff's Testimony

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112, *superseded by regulation on other grounds as stated in Thomas v. Saul*, 830 F. App'x 196, 198 (9th Cir. 2020). "First, the ALJ must determine whether [the claimant has presented] objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*; *see also* 20 C.F.R. § 404.1529(a). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Molina*, 674 F.3d at 1112 (cleaned up).

---

[143] AR 28.

[144] AR 28.

United States District Court
Northern District of California

"The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284; *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102–03 (9th Cir. 2014) (in order to have a meaningful appellate review, the ALJ must explain its reasoning; "[g]eneral findings are insufficient"); *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (cleaned up); *see also* 20 C.F.R. § 416.929. And the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

Here, for the reasons given by the plaintiff, the ALJ's reasoning was not clear and convincing. Because the court has already ordered remand on the step-two analysis, the ALJ can reconsider the plaintiff's symptom testimony on remand.

## 4.   Whether the ALJ Erred by Disregarding Third-Party Witness Statements

The plaintiff contests the ALJ's allegedly inadequate consideration of the plaintiff's sister's testimony and the observations of Social Security claims representatives G. Martinez and D. Tran.

"Under the regulations that took effect in March 2017, an ALJ is not required to articulate how he or she considered evidence from nonmedical sources." *Stephan v. Kijakazi*, No. 22-cv-06021-SK, 2023 WL 7284144, at *9 (N.D. Cal. Nov. 3, 2023) (citing 20 C.F.R. § 416.920c(d)); *Melissa G. v. Kijakazi*, No. 21-CV-05803-SK, 2022 WL 4596623, at *7 (N.D. Cal. July 13, 2022) (same) (family members are lay witnesses).

Given this standard, the ALJ's consideration of the third parties' testimony and observations was not error.

**5.   Whether the Court Should Remand for Further Proceedings or Determination of Benefits**

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court."). "[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Garrison*, 759 F.3d at 1019 (cleaned up).

Here, remand is appropriate to "remedy defects in the original administrative proceeding." *Id.*

## CONCLUSION

The court grants the plaintiff's motion (in part), denies the Commissioner's cross-motion, and remands for further proceedings consistent with this order. This resolves ECF Nos. 16 and 21.

**IT IS SO ORDERED.**

Dated: March 31, 2024

_____
LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California